499 F.2d 514
 162 U.S.App.D.C. 378
 Philip BERRIGAN et al., Appellants,
v.
Maurice SIGLER, Chairman of the board of parole and all
members of the said board of parole (all of whom
have their offices at room 354 HOLC
(Building) et al.
 No. 73-1563.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Feb. 21, 1974.
Decided May 1, 1974.
 
 1
 Morton Stavis, New York, City, with whom Alvin J. Bronstein, Washington, D.C., was on the brief, for appellants.
 
 
 2
 N. Richard Janis, Asst. U.S. Atty., with whom Harold H. Titus, Jr., U.S. Atty., at the time the brief was filed, John A. Terry and Gil Zimmerman, Asst. U.S. Attys., were on the brief, for appellees. Earl J. Silbert, U.S. Atty., also entered an appearance for appellees.
 
 
 3
 Before BAZELON, Chief Judge, McGOWAN, Circuit Judge, and CHRISTENSEN,* United States District Judge for the District of Utah.
 
 
 4
 CHRISTENSEN, Senior District Judge.
 
 
 5
 Despite a preliminary exploration of the problem to the contrary,[1] it has now been determined that a constitutional balance was struck by the Board of Parole between its duties of supervision and the right of parolees to travel in denying leave for appellants to make a trip to North Vietnam under the circumstances, and we therefore affirm the summary judgment of the district court to this effect.[2]
 
 
 6
 Fathers Philip and Daniel Berrigan were convicted of felonies by reason of the illegal activation of their opposition to the Vietnam war.[3] After serving a substantial part of the sentences imposed, they were granted parole upon the usual condition contained in certificates of parole that they would 'go directly to the district shown on this Certificate of Parole . . . (and) . . . shall not leave the limits fixed by the Certificate of parole without written permission from the probation officer.'[4]
 
 
 7
 Having been granted permission on other occasions to leave their districts for speech making and other purposes,[5] on January 8, 1973, appellants unsuccessfully sought leave from the Board to travel to Hanoi 'to visit with religious leaders and others'. They filed their complaint[6] with the district court on January 12, seeking judicial review of the administrative action of the Board, a declaratory judgment 'that the members of the Board (had) interfered with plaintiffs' constitutional rights in denying such permission', to enjoin the defendants 'from interfering with any future travel plans of the plaintiffs wherein they (may seek) to exercise their First Amendment rights', and 'a mandatory order to require that the defendants in their capacity as members of the Board of Parole permit the plaintiffs to make the trip to Hanoi, and any other travel of a similar nature'.
 
 
 8
 At the time of filing their complaint appellants moved for a temporary restraining order requiring the Board to approve appellants' request, which was denied by the district court. On January 17, following oral arguments the preceding day, this court, one member of the panel dissenting, summarily vacated the order denying appellants temporary relief, ordered 'that appellee Parole Board members be, and they are hereby, temporarily restrained from withholding their approval of appellants' proposed trip to North Vietnam', and remanded the case to the district court 'for further proceedings not inconsistent with this order.'[7] Thereupon the solicitor General presented to the Chief Justice an application for a stay of the order of this court until a hearing before the district court on plaintiff's motion for a preliminary injunction could be had. The Chief Justice granted such stay pending reference of the matter to the full court. On January 22, 1973, the Supreme Court, with one justice dissenting, ruled that the 'application for stay, presented to The Chief Justice, and by him referred to the Court, is granted'.[8] Following another hearing, a remand to the Board, and a further hearing in view of the Board's supplemental report, the district court on May 3, 1973, granted the appellees' motion for summary judgment on the merits and accordingly denied appellants' motion for preliminary injunction as moot.[9]
 
 
 9
 We need concern ourselves no further with the procedures below which brought into the record an amplification of the Board's reasons for denial of the requested leave and culminated in the decision on the merits by summary judgment; they are amply outlined in Judge Gasch's Memorandum Order, 358 F.Supp. at 131-133, and were considerate and sufficient to warrant final disposition there subject to this appeal.
 
 
 10
 * The effect of one phase of the preliminary proceedings, however, must be determined, since the first point appellants seek to make is that this court's prior opinion concerning the invalidity of the initial restraining order, 475 F.2d 918, established the law of the case on the merits and now dictates reversal of the subsequent judgment of the district court. It is argued that the record in view of which the district court acted on the application for a preliminary injunction was substantially the same as that which was before this court when it considered the restraining order, and that since 'the sole ground upon which a stay was applied for in the Supreme Court was to permit development of a full record', the district court was bound to dispositively follow the prior decision of this court. Even assuming, without accepting,[10] the validity of the premises, we cannot agree with this conclusion.
 
 
 11
 The decision of a trial or appellate court whether to grant or deny a preliminary injunction does not constitute the law of the case for the purposes of further proceedings and does not limit or preclude the parties from litigating the merits,[11] unless there has been an order of consolidation pursuant to Rule 65(a)(2),[12] not the case here. Much less would rulings concerning temporary restraining orders have the binding effect claimed by appellants.[13] This is not to say that the views expressed by a court at a given time, although not controlling, cannot be persuasive for their reason and authority to the extent applicable in any new context, or that a case may not be rendered moot as a consequence of preliminary rulings under special circumstances.[14] But such rulings did not moot this case[15] and did not preclude the district court, nor should they dissuade us, from taking a fresh look.[16]
 
 
 12
 Appellants advance the following basic contentions additionally in support of their appeal:
 
 
 13
 II. The action of the appellees abridged appellants' constitutional rights under the First and Fifth Amendments; the only basis upon which such abridgment could be justified is a 'compelling governmental interest', tested by 'stringent standards' and subjected to 'rigid scrutiny', which cannot be found here.
 
 
 14
 III. The claim that prohibition of travel to Hanoi was justified by the needs of parole supervision is 'transparently unrealistic'.
 
 
 15
 IV. The Board acted wholly beyond its power in applying foreign policy considerations in its determination.
 
 II
 
 16
 The right to travel is a part of the 'liberty' of which a person cannot be deprived without due process of law.[17] It does not follow, as contended by appellants, that to the extent that a restriction of travel in a particular circumstance may inhibit a person's speaking or associating with others, it necessarily involves an impairment of First Amendment rights. Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), supra, clearly stands against such a proposition.[18] It is fallacious to argue that restriction of travel necessarily interferes with the traveler's prospective right of free speech at the point of destination in violation of the Constitution irrespective of the validity of the travel restriction. Association, as well as speech, always is to be expected and, indeed, may be inevitable at the destination of any travel, but this does not render invalid legitimate restrictions upon travel for any such reason.[19]
 
 
 17
 While we must remain sensitive to the overriding importance of First Amendment rights in the evaluation of restrictions that may be even tangentially related, the enforcement of legitimate regulations must not be diluted or rendered impractical because as an incident to their application speaking, association or writing may be affected. Under the guise of exercising the First Amendment right of free speech, a person may not reposition himself where he otherwise would have no authority to be. Nor can one in reliance upon freedom of the press, by virtue of that reliance alone, legally seize without consideration or lawful warrant the plant of a newspaper belonging to another; it would be one thing to expect to use the columns of the paper to voice views and opinions under appropriate conditions, quite another to move without authority into another's plant for the purpose. On the other hand, it has been held repeatedly that the right to travel is an aspect of the 'liberty' guaranteed by the Due Process Clause of the Fifth Amendment.[20] We conclude that restrictions against the Fifth Amendment right to liberty in travel are involved here, and that such restrictions must be tested by the essentials of due process.[21]
 
 III
 
 18
 As an essential part of any consideration of the travel restrictions as such, the appellants' parole status under the governing statute[22] and regulations is inescapably significant.[23]
 
 
 19
 Parole has its genesis and justification, and carries content, meaning and objectives from due process convictions and sentences for crimes which justifiably deprived the parolee for a time of any power of travel whatsoever, and which, were it not for acceptable conduct have continued to totally deprive the parolee of all power of travel for the remaining period of his sentence. Unless an inflation of 'travel rights'[24] is to engulf the federal correctional system, these realities must not be lost to view. Their importance is pervasive, for the viability not only of parole, but of other enlightened aspects of the system[25] depend upon a reasonable administration of restrictions against travel by convicts whose terms have not expired. The Chairman of the Board of Parole in a supplemental affidavit filed in the District Court following our preliminary consideration of this case explained the Board policy and practice with reference to foreign travel, in which I can find nothing facially unreasonable.[26]
 
 
 20
 The Supreme Court recently observed: 'To accomplish the purpose of parole, those who are allowed to leave prison early are subjected to specified conditions for the duration of their terms. These conditions restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen.'[27] As this court has stated, parolees 'are neither totally free men who are being proceeded against by the Government for commission of a crime, nor are they prisoners being disciplined within the walls of a federal penitentiary. They stand somewhere between these two.'[28] This is not to say that parolees lose their constitutional rights, nor do prisoners in custody. But those rights of necessity are conditioned by the situation in which their convictions placed them. It would be unrealistic to consider their rights wholly separate and apart from their status as parolees, or to disassociate their status either from the public interest which dictated both their confinement and parole at suitable times, or from reasonable conditions upon which they are released.[29] And there is also a legitimate governmental interest in continuing means for information concerning a parolee's deportment and any necessity for closer supervision, or to preserve the therapeutic effect of more general supervision even absent day by day direction.
 
 
 21
 In the original affidavit submitted on behalf of the Board, one of the two reasons of its decision was stated as follows:
 
 
 22
 'Total lack of any means of control to effectuate the Board's supervisory responsibilities looking to the rehabilitation of the parolees, where they would be visiting in an area where the United States has no diplomatic representative of its own or, in lieu thereof, any foreign power to represent it or its interests.'
 
 
 23
 The panel of the court considering the district court's denial of the restraining order concluded per curiam that this stated reason was insufficient because 'the proposed visit to North Vietnam will be of short duration, and it is clear that it will not interfere with the rehabilitation of appellants, especially since the Board has made no active effort to rehabilitate appellants since the date of their release.'[30] In a separate statement by Chief Judge Bazelon, concurred in by Judge Wright, this position of the Board was branded as 'so transparently unrealistic as to cast doubt on its entire presentation in this proceeding.'[31] Judge MacKinnon, dissenting as to the adjudged insufficiency of the second reason, yet deeming the first not enough to justify the Board's action, stated: 'The length of time appellants would be outside the Board's supervision is not sufficient to justify refusal of their request on this ground.'[32] There therefore exists this respected difference of opinion with the writer's view that even though the first reason were to be considered alone there would be a legitimate governmental interest, and a sufficient relationship of the prohibited conduct to the objectives of parole, as to justify the refusal of the requested permission under the circumstances, and that such refusal was neither arbitrary, capricious nor unreasonable.[33]
 
 IV
 
 24
 But aside from any question concerning the first reason assigned by the Board for refusal of the permission to travel, the Board's second reason either independently or supplementally was sufficient to justify the refusal of permission. Such refusal was in adherence to the stated policy that 'the Board will not approve foreign travel to an area as to which the Secretary of State, acting within his foreign relation responsibilities, has determined that such travel is not in the national interest of the United States.[34]
 
 
 25
 Appellants argue that such policy and action are outside the competence of the Board and disregard the decision of this court in Lynd v. Rusk, 128 U.S.App.D.C. 399, 389 F.2d 940 (1967). We do not agree. Both this court in Lynd and the Supreme Court in United States v. Laub, 385 U.S. 475, 87 S.Ct. 574, 17 L.Ed.2d 526 (1967), recognized the validity of area restrictions established by the Secretary of State, and the limitations expressed in both cases on the effects of these restrictions are inapplicable here. We are not concerned with the denial of a passport nor with criminal penalties allegedly arising from civil regulations; but rather with the focused problem of whether the Board of Parole has authority to restrain a parolee pursuant to a general policy from traveling to restricted areas of the world when such travel is deemed by the Secretary of State to be contrary to the national interest. This power is not negated by 'the general principle that authority committed to one agency should not be exercised by another'.[35] The authority to determine the advisability and extent of travel by parolees has been committed to the Parole Board. In making that determination public policy and public interests are not irrelevant. 18 U.S.C 4203, supra.
 
 
 26
 When the case was last before this court there had been merely an informal advice that the Department of State was of the view that insofar as it could perceive there was no basis for its determining that appellants' proposed travel to North Vietnam would be in the national interest of the United States within the meaning of 22 C.F.R. 51.73.[36] The record now establishes positively that the Secretary of State, at the time of the final action of the Board and before the summary judgment appealed from was entered by the District Court, did not consider travel to Hanoi by the Berrigans to be in the interest of the United States.[37] The Parole Board, having exercised its statutory discretion to establish as a general rule that parolees would not be allowed to travel to certain foreign countries, and having permitted an exception when the objective, reasonable tests of 22 C.F.R. 51.73 are met, should not be foreclosed from deferring the application of that regulatory measurement to the agency which created and best understands it. Thus any deficiency in the record heretofore before this court has been corrected and increased support furnished for the view that the Board's position should be upheld.[38]
 
 
 27
 While as argued by appellants 'the Board has not been given the power to enforce the foreign policy of the United States', it is invested with the power and responsibility of reasonably supervising the conduct of parolees. In exercising that power it had the right to consider all relevant factors, including the legality of the travel requested as well as established public policy.[39]
 
 
 28
 In view of the discretion of the Board, uncontroverted facts demonstrate that appellees were entitled to summary judgment as a matter of law and the court below did not err in so holding.
 
 
 29
 Affirmed.
 
 BAZELON, Chief Judge, dissenting:
 
 30
 When this case was before us on a motion for a temporary restraining order[1] we were at pains to point out that 'the authority-- if any-- of the Department of State to grant or deny its permission (for appellants' trip) is not at issue.'[2] What is at issue is the authority of the Parole Board to impose restrictions on the constitutional right to travel.[3] Whatever may be the scope of that authority in the ordinary case, where, as here, the Board seeks to interfere with activities involving the expression of political and social views, it must show a compelling need for the particular restriction it seeks to invoke. No such need was shown in the prior proceeding and none has been shown here. Accordingly, I would reverse the decision of the District Court and enjoin the Parole Board from withholding its approval of appellants' travel.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. 294(d)
 
 
 [1]
 Berrigan v. Sigler, 154 U.S.App.D.C. 334, 475 F.2d 918 (1973). But see Sigler v. Berrigan, 410 U.S. 902, 93 S.Ct. 952, 35 L.Ed.2d 266 (1973)
 
 
 [2]
 Berrigan v. Sigler, 358 F.Supp. 130 (D.D.C1973)
 
 
 [3]
 See United States v. Moylan, 417 F.2d 1002 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970); United States v. Eberhardt, 417 F.2d 1009 (4th Cir. 1969). cert. denied, 397 U.S. 909, 90 S.Ct. 907, 25 L.Ed.2d 90 (1970). See also United States v. Berrigan, 283 F.Supp. 336 (D.Md.1968)
 
 
 [4]
 This and other conditions were identical in the cases of both parolees except for the references to different home districts, as were the other conditions usual under such circumstances. Father Philip Berrigan's home district was Maryland; Father Daniel Berrigan's the Southern District of New York
 
 
 [5]
 Philip Berrigan had been given permission to travel to the District of Columbia and to Los Angeles; Daniel Berrigan to Pennsylvania, Illinois, Hawaii, France, Sweden, England, Japan and Ireland
 
 
 [6]
 Jurisdiction was premised upon the First Amendment to the United States Constitution, the Administrative Procedure Act, 5 U.S.C. 701, et seq., and 28 U.S.C. 1331, 1361 and 2201
 
 
 [7]
 475 F.2d at 920
 
 
 [8]
 Sigler v. Berrigan, 410 U.S. 902 (1973), supra
 
 
 [9]
 Berrigan v. Sigler, 358 F.Supp. 130 (D.D.C.1973), supra
 
 
 [10]
 It is true that in the application for Supreme Court intervention the Solicitor General emphasized procedural aspects by asserting that '(a) stay of the order of the court of appeals should therefore be granted until a hearing can be held in an orderly fashion to determine the legal and factual merits of respondents' claims and until any appeals from the district court's decision after such a hearing or trial can be resolved.' But the Solicitor General in his application also called attention to the view of the majority of the panel considering the restraining order that 'the kind of delicate diplomatic determination (the Board had indulged in) is properly the province of the Secretary of the State', and he argued as further ground for a stay by the Supreme Court that opportunity should be afforded for further consideration whether the Board of Parole may in fact have inadvertently made a judgment inconsistent with authoritative foreign policy considerations. There was before the district court at the time of its final decision an authoritative answer to this question supportive of the position of the Board, as hereafter will be more particularly seen. Moreover, the appellants at the time themselves regarded the ruling the Supreme Court had been requested by the Solicitor General to make as something more than merely procedural, for they requested oral argument before that court on the ground that 'a stay would amount to a reversal on the merits.'
 
 
 [11]
 Industrial Bank of Washington v. Tobriner, 132 U.S.App.D.C. 51, 405 F.2d 1321 (1968); Ross-Whitney Corp. v. Smith Kline & French Labs., 207 F.2d 190 (9th Cir. 1953); Doeskin Prods., Inc. v. United Paper Co., 195 F.2d 356 (7th Cir. 1952); Chicago Great W. Ry. Co. v. Chicago Burlington & Quincy R. Co., 193 F.2d 975 (8th Cir. 1952); Benson Hotel Corp. v. Woods, 168 F.2d 694 (8th Cir. 1948). See also 11 Wright & Miller, Federal Practice & Procedure, Civil 2962 at pp. 630-631 (1973). Cf. Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), and Yablonski v. United Mine Workers of America, 147 U.S.App.D.C. 193, 454 F.2d 1036 (1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972), involving rulings on the merits in significantly different context. Another illustration of this point may be found in Sobell v. Reed, 327 F.Supp. 1294 (S.D.N.Y.1971), strongly relied upon by appellants on another aspect of the case (see p. 520 infra), for there a motion for preliminary injunction had been denied by the district court, its ruling affirmed by the Court of Appeals and interim relief refused by a justice of the Supreme Court; yet on the merits following this, a permanent injunction was granted
 
 
 [12]
 '(2) Consolidation of hearing with trial on merits. Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application . . ..' See Industrial Bank of Washington v. Tobriner, 132 U.S.App.D.C. 51, 405 F.2d 1321 (1968), supra
 
 
 [13]
 See United States v. Washington Post Company, 144 U.S.App.D.C. 321, 446 F.2d 1322 (1971); Ibid., 144 U.S.App.D.C. 326, 446 F.2d 1327 (1971)
 
 
 [14]
 Cf. New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), affirming 446 F.2d 1327
 
 
 [15]
 While the time of the trip for which the original invitation to the Berrigans had expired, the record discloses that such invitation later was extended indefinitely. Although Daniel Berrigan's term of parole has now expired, that of the other appellant continues
 
 
 [16]
 This is aside from the argument of the government that our prior decision was one which ordinarily would seek merely to maintain the status quo pending a full determination on the merits, 'for which the government had less than twenty four hours to prepare argument, which was decided by this court within one day (after argument) and the execution of which was stayed by the United States Supreme Court.'
 
 
 [17]
 Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1968); United States v. Laub, 385 U.S. 475, 87 S.Ct. 574, 17 L.Ed.2d 526 (1967); Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958)
 
 
 [18]
 'Appellant also asserts that the Secretary's refusal to validate his passport for travel to Cuba denies him rights guaranteed by the First Amendment. His claim is different from that which was raised in Kent v. Dulles, supra, and Aptheker v. Secretary of State, supra, for the refusal to validate appellant's passport does not result from any expression or association on his part; appellant is not being forced to choose between membership in an organization and freedom to travel. Appellant's allegation is, rather, that the 'travel ban is a direct interference with the First Amendment rights of citizens to travel abroad so that they might acquaint themselves at first hand with the effects abroad of our Government's policies, foreign and domestic, and with conditions abroad which might affect such policies.' We must agree that the Secretary's refusal to validate passports for Cuba renders less than wholly free the flow of information concerning that country. While we further agree that this is a factor to be considered in determining whether appellant has been denied due process of law, we cannot accept the contention of appellant that it is a First Amendment right which is involved. For the the extent that the Secretary's refusal to validate passports for Cuba acts as an inhibition (and it would be unrealistic to assume that it does not), it is an inhibition of action. There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.' (381 U.S. at 16-17.)
 
 
 [19]
 Aptheker v. Secretary of State, 378 U.S. 500, 507, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), supra, recognizes that freedom of association is itself guaranteed in the First Amendment. It must be noted, however, that the ban on travel was there struck down not because of any prospective restriction of association at the destination of the travel, but because of the overbreadth of the statute; the freedom of association referred to there was association with other members of an organization in this country which, if given up, would have avoided the application of the overly broad statutory provision
 
 
 [20]
 See Shapiro v. Thompson, supra, n. 15, 394 U.S. at 630, n. 8; United States v. Laub, 385 U.S. 475, 481, 87 S.Ct. 574, 17 L.Ed.2d 526 (1967); United States v. Guest, 383 U.S. 745, 760, n. 17, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); Zemel v. Rusk, 381 U.S. 1, 14-15, 85 S.Ct. 1271, 14 L.Ed.2d 174 (1965); Aptheker v. Secretary of State, 378 U.S. 500, 505, 84 S.Ct. 1659, 12 L.Ed.2d 992, (1964); Kent v. Dulles, 357 U.S. 116, 125-127, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). See also Lynd v. Rusk, 128 U.S.App.D.C. 399, 403-404, 389 F.2d 940, 944-945 (1967); Worthy v. Herter, 106 U.S.App.D.C. 153, 155, 270 F.2d 905, 907, cert. denied, 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed. 186 (1959); Shachtman v. Dulles, 96 U.S.App.D.C. 287, 290, 225 F.2d 938, 941 (1955); Worthy v. United States, 328 F.2d 386, 392 (5th Cir. 1964)
 
 
 [21]
 When the case was before this court preliminarily it was said 'that the Parole Board's refusal to approve appellants' proposed visit to North Vietnam interferes with their right to travel and their First Amendment right to freedom of association'. In a very general sense the latter indication was accurate, since the prohibition of travel would as an incident involve a restriction on association. But if there were no right to travel to North Vietnam, there would be no right of association there in the constitutional sense, as rendered clear by Zemel v. Rusk, supra. We find specious the appellants' argument that Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), is to the contrary, for in Mandel, it was recognized that the rights asserted in Zemel v. Rusk, were those of the passport applicant himself rather than those of the American academics who had invited the applicant to participate with them in discussion in the United States. To emphasize the contrast, the court referred to other cases which, as Zemel v. Rusk did, dealt with action or the power to control physical movement. Sobell v. Reed, 327 F.Supp. 1294 (S.D.N.Y.1971), supra, is neither apposite on its facts nor persuasive in its generalizations going beyond them to the contrary. There the court found with considerable support in the record that the real purpose, effect and intent of a restriction against the travel of a parolee was to limit the First Amendment right of free speech and assemblage, and applied First Amendment criteria to mark the invalidity of such restriction. There is no such factual indication here
 
 
 [22]
 18 U.S.C. 4203 provides in part:
 '(a) If it appears to the Board of Parole from a report by the proper institutional officers or upon application by a prisoner eligible for release on parole, that there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, and if in the opinion of the Board such release is not incompatible with the welfare of society, the Board may in its discretion authorize the release of such prisoner on parole.
 'Such parole shall be allowed in the discretion of the Board, to return to his home, or to go elsewhere, upon such terms and conditions, including personal reports from such paroled person, as the Board shall prescribe, and to remain, while on parole, in the legal custody and under the control of the Attorney General, until the expiration of the maximum term or terms for which he was sentenced.'
 
 
 [23]
 28 C.F.R. 2.28-2.32. Section 2.28 with reference to travel by parolees provides in part as follows:
 'Except as otherwise provided in this section, it is a general rule of the Board that a parolee may travel outside his supervision district only with the prior approval of the Board. Travel outside a district without prior Board approval may be authorized by a probation officer subject to the following-described limitations
 '(a) Board approval shall be required for vacation trips outside the district.
 '(b) Board approval shall be required for recurring travel outside the district, except in cases involving parolees who cross district boundaries to engage in or seek employment or for shopping or recreation, if such travel is not more than 50 miles from the district line.
 '(c) Board approval shall be required for travel outside the continental limits of the United States, including travel or work aboard ship.
 '(d) Board approval shall be required in any case in which specific travel conditions have been imposed upon the parolee by the Board . . ..'
 
 
 [24]
 '. . . The right to travel is protected by the Constitution, being a part of the right to liberty. But the simple, succinct phrases of the Bill of Rights, indestructible protections to some of the fundamentals of our way of life, can be, and often are, expanded by rhetorical inflation beyond all semblance to the realities with which they were meant to deal.' Worthy v. Herter, 106 U.S.App.D.C. 153, 155, 270 F.2d 905, 907-908, cert. denied, 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959), supra
 
 
 [25]
 For example, the Attorney General may extend the limits of the place of confinement by a prisoner as to whom there is reasonable cause to believe he will honor his trust by authorizing him under prescribed conditions to visit specifically designated places for a period of not exceeding 30 days or to work at said employment or to participate in a training program in the community on a voluntary basis while continuing as on provisions of the institution or facility; and extensions may be granted for the reestablishment of family and community ties or for other significant reason consistent with the public interest. 18 U.S.C. 4082 as amended. The most recent amendment continued the progress of statutory liberalization by authorizing extensions for 'significant reason' in lieu of 'compelling reason' as the statute formerly read. Act of Dec. 28, 1973, 87 Stat. 907 (1974)
 
 
 [26]
 '. . . With respect to travel either within the United States or outside the United States, the Parole Board recognizes the First Amendment rights of parolees. Board policy is to permit the parolee full exercise of such rights, subject to the necessary limitations that a parolee not engage, or propose to engage, in criminal conduct, or other activities clearly incompatible with the conditions of parole. In this connection, where a borderline situation is presented, the Board must perforce make an ad-hoc determination under all the known factors or circumstances of the case, where to approve the particular travel application
 '. . . With respect to travel outside the United States, the Parole Board policy, in the case of a parolee whose representations appear to be bona fide, and who the Parole Board considers will not abscond, is to allow such travel, subject to this exception: The Board in the exercise of its statutory discretion has determined not to permit a parolee to travel to any area where the Board totally lacks any official means of communication with the parolee in the discharge of its responsibilities, or of ascertaining, in the discharge of its responsibilities, whether activities engaged in there by the parolee are consistent with the terms of parole and in particular, the representations made to the Parole Board by the parolee in securing its approval for the travel.
 '. . . The Board will not approve foreign travel to an area as to which the Secretary of State, acting within his foreign relations responsibilities, has determined that such travel is not in the national interest of the United States . . ..'
 
 
 [27]
 Morrissey v. Brewer, 408 U.S. 471, 478, 483, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)
 
 
 [28]
 Hyser v. Reed, 115 U.S.App.D.C. 254, 259, 318 F.2d 225, 235 (en banc), cert. denied, 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963)
 
 
 [29]
 And not entirely irrelevant to public policy is the desirability of not so weakening the discretion and means for proper supervision on parole as to discourage its being granted by those having discretion in that matter, or to discourage the support of the public for appropriate liberality in such decisions
 
 
 [30]
 475 F.2d at 920
 
 
 [31]
 475 F.2d at 951
 
 
 [32]
 475 F.2d at 923
 
 
 [33]
 Parole supervision often can be exercised effectively by means other than regular meetings or repeated communications and, indeed, my experience indicates that some of the most effective kind does not involve frequent contacts between parolees and parole officers. Reasonable conditions themselves, and a reasonable insistence upon compliance with them, have been found of beneficial effect both with reference to a particular parolee and with respect to others as well. Equally important is the preservation of apparent means for obtaining information concerning the conduct of parolees. Moreover, while individual situations must be considered, failure to adopt a general policy keyed to the broad necessities of the parole system, could only lead to a breakdown of that system and the involvement of the Board in myriad problems of subjective differentiation. I am mindful of some deprecation of the latter consideration that could be gathered from Washington Post Co. v. Kleindienst, 161 U.S.App.D.C. 75, 494 F.2d 994 (D.C.Cir. 2/21/74), 42 U.S.L.W. 2459, affirming, 357 F.Supp. 779 (D.D.C.1972). See also Washington Post Co. v. Kleindienst, 357 F.Supp. 770 (D.D.C.1972), ibid, 406 U.S. 912, 92 S.Ct. 1761, 32 L.Ed.2d 112 (1972), and 477 F.2d 1168 (D.C.Cir. 1973). But I deem the facts and controlling principles of the present case to be essentially different. Here the Board in the exercise of its statutory discretion had determined as a rule of general application not to permit parolees to travel to any area where the Board totally lacked any efficient means to communicate with them, to ascertain whether activities engaged in there by the parolees are consistent with the terms of parole and the representations made to the Board by the parolees in securing approval for travel, or to reestablish their custody in the event that they to engage in illegal activities. Too, the Board's general rule recognizes, and not without reason, that to allow a parolee to go completely beyond any effective control could itself encourage violative conduct. Departure from that policy in the case of the Berrigans would have been disruptive in principle and even on the basis of subjective evaluation unjustified, in view of the fact that their strong feeling on the war and Vietnam already had led them into criminal violations. Earlier Board approval of travel to Hanoi by parolee James R. Hoffa has been referred to by appellants in implied justification for similar leave to them. The proposed trip by Hoffa was cancelled when the State Department refused to validate a passport for him and the Board then conceded that such travel had been improvidently granted. If the Hoffa episode was disruptive or an embarrassment for the parole system, the granting of similar leave to the appellants would only be a magnification of these unjustifiable effects. These are some of the considerations which impel the writer to believe that the requirements of reasonable supervision in themselves justified the denial of the requested leave as determined by the court below. 358 F.Supp. at 138-140
 
 
 [34]
 Affidavit of January 19, 1973, of appellee Sigler. This position was reaffirmed in the Board's February 2, 1973 en banc reconsideration of appellants' request after the Board had been informed by letter that 'the Secretary of State has concluded that the proposed travel of Reverand Philip Berrigan and the Reverand Daniel Berrigan to North Vietnam is not in the national interest of the United States.' See 22 C.F.R. 51.73
 
 
 [35]
 Textile & Apparel Group v. FTC, 133 U.S.App.D.C. 353, 410 F.2d 1052, 1057, cert. denied, 396 U.S. 910, 90 S.Ct. 223, 24 L.Ed.2d 185 (1969), relied upon by appellants to demonstrate that the Board should have disregarded the determination of the Secretary of State in reaching its decision
 
 
 [36]
 Based upon a representation of the United States Attorney at the time
 
 
 [37]
 The record contains a copy of a letter dated February 2, 1973, from Barbara M. Watson of the Bureau of Security and Consular Affairs of the Department of State to the Chairman of the United States Board of Parole reading: 'In response to your letter of February 1, 1973, I am authorized to advise you that the Secretary of State has concluded that the proposed travel of Reverend Philip Berrigan and the Reverend Daniel Berrigan to North Viet Nam is not in the national interest of the United States
 'In reviewing the matter at your request, we have applied the criteria of Title 22, Code of Federal Regulations, Section 51.73.'
 
 
 [38]
 'However, the second ground is 'facially legitimate and bona fide' within Kleindienst v. Mandel, 408 U.S. 753, 769-770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), and must be sustained.' (Dissenting opinion of Judge MacKinnon, 475 F.2d at 923-924.)
 
 
 [39]
 In different context, yet with point here, this court has said that 'the law presumes implied power in a government agency-- unless precluded by a contrary provision expressed or clearly discernible in its organic statute-- to cooperate with other government agencies concerning intermesh of jurisdiction or other matters of mutual concern.' Municipal Intervenors Group v. Federal Power Com'n., 153 U.S.App.D.C. 373, 376, 473 F.2d 84, 90 (1972)
 
 
 [1]
 See opinion of the court, supra at 517
 
 
 [2]
 Berrigan v. Sigler, 475 F.2d 918, 920 (1973) (Bazelon, C.J., concurring)
 
 
 [3]
 Id. at 920, 921